May it please the court, my name is Diane Valencourt. I represent the plaintiff appellant Ruby Russell who's here present and I'd like to reserve two minutes for rebuttal. You have whatever time is left on the clock so long as the light is green or yellow. If it's red, you're in for negative number. I'll attempt to watch. It gets intense. I know. This is a case where conduct speaks louder than words. Nobody said to Ruby Russell we're not promoting you because you're black, but City of Reno officials may as well have. What we have here are inconsistent standards applied inconsistently in a context where through its affirmative action plan, City of Reno recognized under-representation of minorities, racial minorities, and the need for accountability, consistency, and transparency. We have a stark pattern where City's only African-American office assistant is kept in the bottom rung position while all others, all 42 others, am I speaking too loudly? No, you know your time is limited so you know we have read the record and I know you you're trying to eat us into the case but I can assure you we have read the record and we know the case. The issue, the question for us as I see it, and my colleagues may disagree, is she entitled to a trial whether disputed issue material fact such as the case should go to the jury. Right. We are not here to persuade us that she was discriminated against because we are not the jury. Okay. We couldn't fight. So the question is has she made a prima facie case of discrimination and under the McDonald-Douglas analysis we essentially, if I understand correctly where we are in the analysis, she's made a case, they've come up with a reason, and we are at the pretext stage. That's where the rubber hits the road. And the question is what evidence has she presented that would entitle her to go to a jury on the question of pretext? Okay. Is that where we're at? Correct. Okay. So let's just talk about what those things are. Well pretext, first we have the flip-flop in justifications where immediately after the first three what you call the flip-flop is that these were just different people giving different, different decision-makers giving different reasons. Okay. Human resource. We shouldn't argue. I'm just telling you what I think they're arguing and so I want to give you a chance to, and they said look one person said this, another person said that. That's not an inconsistency. This is simply two different reasons that different people along the way had for rejecting her for the job. What's your answer to that? Okay. Human resources manager Turner gave her reasons that lack of enthusiasm was the whole concern. She was every bit as qualified and she also said in that tape-recorded conversation that she discussed this with Mr. Wright who gave those other reasons and he agreed. She looked at his notes. She had her notes. She referred to those notes and enthusiasm was the whole concern. All of a sudden in litigation Mr. Wright and Ms. Turner have this host, this laundry list of problems with Ms. Russell that she had bad attitude, expressed a know-it-all attitude. None of that came up before and Ms. Turner represented that that was also Mr. Wright's position immediately after those rejections. When we look at this record, we get past her making out a case, we get to their excuse, their reasons for it, and what I think you may want to ask us, tell us is that you can't decide on a summary judgment as a matter of law that they carried the burden? Absolutely, Your Honor. And the question is when that decision is made as a matter of law, was there? And you can tell us why there was error if you think there was. Well, why there was error? Sure. She gave a reason. They said, no, here are the real reasons. And that they were at issue. And the court said they are entitled to summary judgment because they've carried the day. And don't you want to talk to us about that? Right. Yes, I do. And the court said, first of all, we had statistical pattern evidence. Not a single African-American was in a higher ranking office assistant position. Forty-two others, all, none of them African-American, one African-American. That, in the Noyes case, in the Green case, that is considered a evidence of pretext. It can go towards evidence of discriminatory animus. We have the changing justifications from what she was told immediately after the rejections to what was said in answers to interrogatories. Judge Kaczynski, we probably know more about this case than you expect us to know. We do know that. We do know that Minnie Weiss went in as position two. She went in as position one. She's the only person at position one. Isn't that so? I'm sorry. I don't understand your question. That's not a question. Go ahead. You make the argument. But I wanted you, if you want to, to get to the point that we're going to have to decide. Isn't there a point we're going to have to decide? Yes. Well, we believe that we've placed in issue the credibility of the employer's justification. And that the judge... Let's just go over the basis of your evidence that you think justifies going to jury. You've got your statistical disparity. Correct. And you've talked just a little bit about that. The zero, right. And then you've got the qualifications of the other candidates who were selected. Your position is the jury could find that they selected less qualified candidates over your client. And then the only explanation for picking the less qualified candidates rather than her who's more qualified... ...is that right? That's right. For example, Ms. Chayne Tucker had 18 years telephone experience and failed in emergency dispatch. And the judge found that that better qualified her for the call center position than Ms. Russell's three and a half year success as the de facto call center when there was no call center, answering upwards of 250 calls for information, plus her 18-plus years of experience. And I think there is definitely an issue of fact whether emergency failure in emergency dispatch trumps success in the busy office of the city receptionist where Ms. Russell was performing the call center jobs as part of her job at lesser pay and lesser status. And I think that strongly places into consention the fact that Ms. Russell's three and a half years of experience in emergency dispatch was not a failure. The defendants' justification for rejecting Ms. Russell. Okay. Let's go down the list. You also have the fact that they used subjective hiring criteria. That's another basis of... That's right. Why don't you speak to that? Well, okay. We all know that subjective criteria isn't discrimination per se. But when you have objective evidence, such as the complete absence of African Americans in the higher levels, that can be evidence that should, in the cumulative effect, bring it towards a jury where a jury should be able to say that there is discrimination here. Because subjective reasons are susceptible to changing, changing rationalization afterwards. And also, there is no documentation to back up their subjective reasons. The only evidence they have was the answers to interrogatories. Also, we have the falsity of Mr. Wright's assertion that he relied on Leslie Ann Hayden, his assistant, for information that Ms. Russell did not have. And that Ms. Russell had bad attitude and problems with co-workers. Ms. Hayden testified to the precise opposite, that in all her dealings with her, Ms. Russell was only polite and helpful and professional. Wasn't there factual, isn't there some factual basis for questioning whether she had a bad attitude? Hadn't she won some prizes? The only basis for that was answers to interrogatories that were produced by Ms. Hayden. They were produced following this litigation. There's no documentation of that. I was asking you so that you would tell us if it's a part of the record, because she's coming in a minute. Oh, yes. It's absolutely. She's going to have to talk about it. Okay. There were things said about her that were inconsistent with the record. Is that right or not? Things said about her in this litigation that were... About Ms. Russell. Yes. Okay. Perhaps you're talking about she was terminated from the municipal court position. I'm talking about after she came to work at Reno. At Reno, in the city attorney's office. Okay. She had problems in emergency dispatch. Did she win any commendations? Pardon? Did she win any commendations? Is my memory wrong? Did she win any accommodations? Oh, commendations. Absolutely. She won commendations for her teamwork, her ability to get along with her helpfulness. All I was doing was giving you an opportunity to put that on your record. Thank you. When she comes up, she's going to have to rebut it. I appreciate that. And you hadn't told us that. There were things on the record that were inconsistent with statements of a subsequent... Many things on the record, including the high praise of her supervisor for exactly the traits that are required in a call center position. I see I have a red button, and I would like to have a little time for rebuttal. Okay. We'll see. We'll hear from the other side now. Thank you. Your Honor, may I please record Aldous Campos Mercado on behalf of the City of Reno. It's hard to speak into the mic. I will. Thank you. We short people have trouble with mics. Thank you. I'm always having to sort of bend over and pull over. Well, I'd like to begin by addressing some of the Court's questions and some of the contentions that have been raised. You can start wherever you want to, but sooner or later, you're going to have to talk about pretext and the answer to pretext and the fact that there's enough to grant summary judgment rather than a trial on those two issues. Don't you think that's what we're going to have to decide? Absolutely. Because the district court, viewing the evidence in the light most favorable to the appellant, determined that there was a primary case of discrimination. That's not an issue here. There's not an issue about the legitimate, non-discriminatory reasons that have been conceded on page 2 of the reply brief. The trust will acknowledge that the city proffered legitimate, non-discriminatory reasons. So now they come before this Court saying there are several reasons why pretext applies. And some of those reasons that are given on appeal were not reasons that were given below. They are appellate afterthoughts that, having not had the evidence to assess. Like what? What is it that you think? The statistical evidence, for one, was not an issue that was raised below. And if you look at the court's order, the court lays out, the district court lays out three bases for why pretext was not established in this case. And one of the issues that you raised, Judge Ferris, whether Ms. Russell had commendations. Of course she had. She has been a good employee. The question is whether she was the employee for these call center positions. Recall that this is a case that started out with three claims. One for disparate impact. One for disparate treatment under 1981. And then one for under 1983. We presented evidence that, and let me back up a little bit. The complaint started out with allegations of 12 alleged rejections of this particular employee. Well, the evidence demonstrated that Ms. Russell was either not qualified or ineligible for 10 of those 12 positions. So what this case boils down to is two cases or two incidents where she was denied a promotion in favor of more clearly qualified employees. What was the final reason given for not using her in this position? There were several reasons. But wasn't there one where the person making the decision decided that he owed a favor to someone else? That was one of the instances in the first time she applied. She applied once in May of 2003. She applied again in July of 2004. And I believe actually that it may be July 2004 that that was one of the issues that had arisen, that there was an employee that was looking for a position as well. But Mr. Wright still allowed for an interview of those, of all the candidates. And so that was an issue with that. But if she is allowed to pay off a favor, as he says, that sort of crosses out the validity of the entire selection process. You can run through the process. You can pretend to be applying criteria. But if you're really, what you're doing is preselecting a candidate, then this will undermine his entire validity of the process. But that was not the only basis on which Michelle Anderson was selected for the July 4th or the, I'm sorry, the July 2004. I don't think there's any candidate out there who wouldn't like to run a selection gauntlet and also have some of this extra benefit of having someone owe the favor if they, you know, a favor paid off if they pick you. But Michelle Anderson nevertheless went through the process. And I don't know that she was the one that was owed the favor on, because there was some issue as to whether or not it was Judy Dexteria who came in in the 2003. But that particular person did not go up against Ms. Russell. There are the two instances. The issue of the enthusiasm, you mentioned the subjectivity. That was with regard to the May 2003 application. And there were, I believe there were three positions available there. And so the qualifications of each of those candidates was laid out. Isn't that a clear issue of fact as to whether or not they were right about her lack of enthusiasm? There was certainly testimony on both sides of that, wasn't there? Well, no, Your Honor, because there were two different. That was not the only reason. That was the reason that Kathleen Turner gave when her testimony was given. That was not the only reason given for not selecting her for the May 2003. Although she was a telephone operator, that was decades ago. And if you look at the qualifications of each of the candidates, each of the candidates had more recent qualifications dealing with customer service, dealing with emergency dispatch. Michelle Anderson had been an emergency dispatcher for two years recently. I mean, she was in that position at that time. Was she the one who Wright said he owed a favor to? I know that she came from the Emergency Communications Center, but I don't know that she was the one. She got the job, didn't she? Correct. But I don't believe that she was the one who got the job simply because the favor was owed. Because there was the instance where Judy Texteria was the one looking for a position in November of 2003, but Ms. Russell was not up against that particular employee. I can't say the difficulty, because I get one vote. There are three votes. But the difficulty, it seems to me, is this was ruled as a matter of law, and we have a question. It's obvious that there's a question of fact. And how do we get around the fact that there were allegations made, there were counter allegations made, and somebody had to decide who was telling the truth? Because I don't believe that there was any evidence presented. That was the problem. What you heard today is not necessarily what's in the record. And if we look at the statement. Well, you're saying there was no evidence presented, but there was evidence presented as to the reason she was not given the position. And there was. Wasn't there? And that evidence is uncontroverted. There was no evidence of pretext. That's the problem. No. What is uncontroverted and what you have pretty difficult to controvert is one of the reasons is she didn't show enough enthusiasm. Now, what does that mean? It means nothing legally, does it? Well, that is a factor. And that certainly is a subjective factor that an employer can look at. But when we look at this record, how do we say that wasn't the reason she didn't get the job? Because there's other reasons in the record. Well, we decide, we decide as a court of appeals one of these other reasons why they didn't, not this list of reasons that are not correct. No, Justice Ginsburg. I don't think that you need to decide that. I think what was required at the summary judgment level was for the appellant to bring evidence showing pretext and to show specific and substantial evidence of pretext. And that wasn't done. If you look at the record at page 13 of Judge Pick's order, he identifies this is what I have before me. What I have is a plaintiff saying I'm better qualified than those people, but all she's presented in that regard is her own subjective belief that she's better qualified. And the question at this point should be whether she is. Well, let's talk about a couple of these. And you can tell me if this evidence is from the district judge. As to the question of enthusiasm, there was evidence that the supervisor relied on another witness, a secretary or an assistant, for the evidence that the plaintiff lacks enthusiasm. And I thought there was evidence in the record that this person said, I don't know. I think she's very enthusiastic and contradicted the supervisor on that. Is my understanding of the record incorrect? I believe the difference there, Your Honor, is. Why don't you answer my question? Okay. Is my understanding of the record incorrect? I believe that it is. Okay. Why don't you explain to me how it is? I will. Because Kathleen Turner was the HR person who sat in on the interviews in May of 2003. Now, there is another woman who is Ms. Russell's current supervisor. And if you read her transcript, it's not the same as the way that it's depicted in the briefs. What she says is at this point, yes, she's enthusiastic in doing her job. This is comparing her to her position as a receptionist, not the enthusiasm shown in taking a position where it was going to be complete customer service to employees. And I think that there's a distinction there. I think that's an argument the jury might find persuasive. But my guess is that Ms. Russell's counsel would say, no, you can't read that testimony so narrowly, that when they claim this person says she's not enthusiastic and she comes out and says she is enthusiastic, that you have to read that as being a contradiction. And you can't sort of cabin and say, oh, she's only talking about today. They're not talking about yesterday. This is the kind of stuff that gets sorted out before juries. And I'm sure you're going to be very persuasive when you get to the jury. I'm sure that, you know, of course, the other side will be persuasive as well. Let's talk about another question. There's the issue of the affirmative action plan. The City of Reno has an affirmative action plan? They have what was called a diversity action plan. And that's another issue that wasn't raised, again, in the court below. The issue with this, with that diversity action plan is with the City of Reno, and this is one of the arguments that there's no African-Americans higher up. Well, the picture of the diversity action plan has Charles McNeely, who's the city manager, who's African-American. And what he is trying to establish is creation of a goal for just that, making sure that minorities and women are represented in the city employment. And I believe that he has done that. Now, this has been something that has been brought up in this case, but this is not the – nobody has presented any evidence that the diversity action plan has been violated in any way, and that's the problem. Is the affirmative action plan in the record? Yes. Okay. So it was not something that they pulled out of thin air and brought here on appeal. It was in the record below. The way that it was presented below is City has a plan, and they've denied its existence, and now they're trying to deny its existence, and that certainly didn't happen. I mean, it is in the record, and that's something that the way that it was argued was that that affirmative action plan mandates this and mandates that. Was there compliance with – or was there evidence as to compliance with the affirmative action plan? Well, there was no – again, going back to the statistical issues, none of that was presented in the court below. There was never an instance where somebody said there's so many African-Americans in this community, and therefore, this should be the representation within the city. We've never had an opportunity to address that. The district court certainly didn't have an opportunity to address that. When we got to the district court – Do I have an opportunity to address that? Well, I believe the opportunity – I've never been placed to do this in district court. Well, quite frankly, Your Honor, I think the fact that the City has presented legitimate reasons that have not been refuted demonstrate that there is no issue with that, that the pretext has not been established. And so the fact remains that if the City presents any reason that's not a discriminatory reason, and I believe it's presented many in this record, that summary judgment should be affirmed because the district court has correctly determined that there was no issue of fact with regard to whether or not Ms. Russell was treated on a discriminatory basis. And I believe the record – Wouldn't the City of Reno feel better having 12 members or eight members of the community make this decision? Your Honor, this is a dispute between the City itself and one of its employees. Isn't it the kind of thing that the City will feel far more justified when it gets vindicated by a jury? I believe the City would feel very vindicated if this case was affirmed on appeal, and that's what I'm asking this Court to do. Okay, thank you. We'll give you a minute for a bottle, if you wish. We'll give you a minute for a bottle. You're over your time, but we'll give you a minute if you wish to take it. Other counsel represented that issues were not raised in the lower court. That was addressed in the reply brief. All the facts were before the court, and the issues, while not articulated in exactly the same words, were definitely below the lower court. Judge Kaczynski, you asked a question about reliance on an assistant. That assistant was Leslie Ann Hayden. That's the one, yes. Okay. That was answered? Okay. No, no, you can go ahead. Oh, okay. I have trouble with names. Mr. Wright alleged that Ms. Hayden told him that Ms. Russell had difficulties with coworkers and bad attitude, and she testified to the precise opposite, that she was only professional, helpful, and courteous in all her dealings with her. So she directly contradicted the answers to interrogatories by Mr. Wright, his own assistant. Third, the diversity action plan was definitely part of the record. It was definitely argued, and focus was on the provision to create an aggressive outreach program to increase the number of minority female applicants for vacancies in underrepresented job classifications. It was acknowledgment of underrepresentation, and they said that their job, part of their goals, were to monitor job classifications. I think we do understand. Before we submit this case, let me just offer my own personal view. I don't know if my colleagues share this, but, you know, this sounds to me like the kind of case that should be capable of resolution by the parties for mediation. You know, you've heard our questions here. You know, we, as you can see, we understand the record very well. And, you know, I can't predict how we're going to come out. We don't discuss these cases ahead of time, so I can't tell you. I can at least say that I'm skeptical about what the district judge did here. But, again, I need to confer with my colleagues. And I would urge the parties to, you know, they're here together. They have the plaintiff present. I'm sure that the defendant can be gotten on the phone. And this is something to be said for trying to, in light of our questions, trying to avoid the risk of further litigation in this case by perhaps mediating the case and trying to settle it. And in that regard, we have a very fine mediation office here in the building. They have exceptionally good success. They, believe it or not, have settled criminal cases, including death penalty cases. Unbelievable as that is to contemplate, but they have. So, really, I got a letter the other day from a lawyer praising their services as being highly professional and very useful. So, again, I'm speaking for myself. I don't know if my colleagues agree with this. I agree with you completely. I'm sure my colleagues will be willing to defer submission for a week or perhaps longer if the parties need it to allow for the possibility of mediation, either through our mediation service, and you can ask the deputy clerk where the mediators are and, you know, go speak to them or through some other means. And if one would do this, I will defer submission for a week. If counsel, after a week, within that time, send me a letter or send a letter to the clerk, which will be directed to us asking for more time, we will continue, you know, for a reasonable amount of time, we'll continue deferring to allow the parties to, if they believe they are in serious settlement discussions. Or if you are working with the mediators, the mediators can inform us. You don't need to do anything. They let us know to continue to defer. If I don't hear either from the parties or the mediators within a week from today, we will simply issue an order submitting the case when we will decide it, and it will be what it will be. I can't – I can simply express my personal skepticism about what the district court did here. I can't speak for my colleagues. And, of course, when we confer, we often change our minds because we, you know, we talk to each other. So don't take this as any kind of indication as to what would happen if we decide the case. But you've heard the questions here. This is not a slam dunk of firm, let's put it that way. I mean, obviously we have lots of questions. So I think this is exactly the kind of case where justice will be served. And, again, this is an employment relationship. We would hope that the city and the plaintiff, after this is resolved somehow, will be able to continue as employee-on-employee and have a continuing, flourishing relationship. And there's nothing like a trial to destroy that possibility. So, again, I will, with the concurrence of my colleagues, I will defer submission for a week and hand it over to the parties. And I hope that you will take this opportunity and you will have learned from our questions as to how this case is viewed, not from your individual perspective as litigants or as parties, advocates, but how objectively the case is viewed and perhaps find a way of – a way clear to a resolution. Okay? Thank you, Your Honor. We will, again, with my colleagues, we will defer submission for a week and hope to hear from you that things are going well towards settlement. We will now take our recess and hope that we will, when we come back, have a video conference. Thank you. Thank you. And thank you, counsel, for the fine arguments. All rise. This court is adjourned. Recess. Okay. Good. Anthony? So, first, we have Anthony Smith. So let's get – let's clear that. There's Smith. First, I'll submit it. Yeah, yeah.        Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. All right. Here's the back box and we need the records for that. It's over on the chair. And I guess we'll come back for this one? I just... I can see... I can hold for a few seconds. And I'll be right back. Where's the... Oh, you have the person at all? I do. Can you do it? I just...  I guess it's over here? Yeah, of... Is he here? I can move my hand on his way, there's a, put that...   There's... I'm on the chair one more time just in case. Yeah, I've been speaking with him. Okay. Okay. Okay. Russell. The Russell benchmark. Okay. Take that. No, no, because... Oh, that's great. Okay. No, I think the... Yeah, I'm pointing at him. You can just take it, actually. No, I don't want to interrupt him again. I mean, just hold it. Take it as a whole view. Okay. Oh, he sits here, so this way. Oh, I think... Oh, thank you. No, I'm just taking a few minutes. I'm sorry? No, I just took a few minutes. Oh, okay. Yes. I thought maybe you could... Okay. Thank you. Russell, can you hold that? Okay. Okay, I see you. Sorry to interrupt. How are you doing? Should be established. Just a second. Okay. Good morning. Is that Mr. Lipsius? Yes, it is. Can you hear me? I hear you perfectly well, sir. Do you hear me? This is Kwame Copeland. Perfectly, and I thank you very much for all your efforts, Mr. Copeland. Certainly. Is there any way we can get the camera focused in closer on you? This is fine, but if we could get it zoomed in just a little bit, we'd be in much better shape. Excellent. Is that better? Yes, sir. Okay, I think we're ready to go. Let me speak up from the bench really quickly, make sure that you're getting that... Do you see the timer well, sir? Pardon me? Do you see the timer? Yes. It says ten minutes. Right on. Can you hear me clearly from up here, sir? Perfectly. Excellent. Thank you. Hello, Ira. How are you doing? Okay, how are you doing, Jim? Good. Thank you. How are you doing? Good. Thank you. Try this. Okay. Yeah. Yeah. Oh. Yeah. Okay. Okay. All right. Yeah. Good morning. I think it's still morning, and we have our video connection active. This is the case of...
judges: Kozinski, Farris, Panner